## Schuylkill County Commissioners' Appeal.

C. E. Berger, for appellants.

R. A. Freiler and J. A. Adamson, for county controller and minority commissioner.

HICKS, J., May 26, 1930.—This is an appeal by the county commissioners from the action of the salary board in failing to fix the salaries of five additional clerks, employed temporarily by the county commissioners, and is brought in accordance with section 7 of the Act of March 31, 1876, P. L. 13, and was heard by the court in banc.

From the pleadings and the evidence, we make the following

### Findings of fact.

1. The appellants, James R. Walton and James H. Kirchner, are the majority members of the board of county commissioners, R. E. Brownmiller is the minority member, and William R. Adamson is county controller.

2. At a meeting of the board of county commissioners held on March 3, 1930, all the commissioners being present, a motion that five temporary clerks be added to the present force in the commissioners' office for the purpose of assisting in getting out the precepts and tax duplicates as required by law, their work to commence March 4, 1930, was adopted.

3. On March 3, 1930, and March 5, 1930, five competent persons, resident freeholders, were appointed in pursuance of the foregoing resolution.

4. The salary board, at meetings held on March 3, 1930, and March 31, 1930, failed and refused to fix the salaries of the temporary clerks, Commissioners Walton and Kirchner voting in favor of fixing the salaries at $160 per month, and Commissioner Brownmiller and Controller Adamson voting against the same.

5. The county commissioners, at a meeting with all present on April 2, 1930, fixing the salaries of the additional and temporary clerks at $160 per month, drew warrants in payment thereof to April 1, 1930, but the county controller disapproved them.

6. The five temporary clerks additionally employed by the county commissioners have been and are now engaged in preparing and sending out to all the assessors of the county, 107 in number, the precepts for the making of the triennial assessment in 1930 and the sending to them of the proper assessment books for the respective districts, into which the temporary clerks have written the names of the taxables, location, general description and size of the

taxable property and such other information as the county commissioners have of taxables and taxable property in the assessor's district.

7. The valuations are left blank for insertion by the assessors and spaces allowed in the assessment books for additional discoveries and valuations by the assessors.

8. The employment of these additional clerks would not be necessary if the county commissioners simply transmitted the precepts to the assessors for the making of the triennial assessment and the blank assessment book in which to list the taxables and set out the valuations.

9. It is admitted by counsel for the county controller and minority commissioner that the practice in this county from time immemorial has been to furnish the assessors in the triennial years with assessment books containing the information now being inserted by the additional clerks.

10. In pursuance of said practice of former county commissioners, as set out in the foregoing paragraph, five extra clerks have heretofore been employed in former triennial years.

11. Prior to the triennial assessment to be made in 1930, the precepts were issued to make the triennial assessment on or before the second Monday of September and the assessors were required to complete the assessment and make return thereof not later than Dec. 31st; now, the precepts must be issued on or before June 1st and the assessors are required to complete and return the same not later than Sept. 1st.

12. The preparing and sending out of the precepts and triennial assessment books must be performed by the clerks in the commissioners' office at the same time as the extra work of preparing for the spring primaries and the five additional clerks were necessary to do this work; heretofore the regular office force would have had no additional labor to perform while preparing and sending out the precepts and assessment books, since they could have been prepared after the spring primaries and before the second Monday of September when they had to be sent to the assessors.

13. All the clerks employed in the county offices, except some employed in the prothonotary's office at $4.50 a day, receive a minimum monthly salary of $160 a month, which is a reasonable sum.

14. For accuracy and comprehensiveness of triennial assessment, its completion and return when required by law, it is needful that the assessors be given all helpful information as to taxables and taxable property in the possession of the county commissioners, especially since the triennial assessment is the basis for taxation for three years in the entire county, subject to restricted statutory changes between the triennials.

15. No necessity exists for the employment of the additional clerks after June 1, 1930, the last day for the transmittal of the precepts and assessment books to the assessors. If any additional clerks are needed after Sept. 1, 1930, when the assessment books are returned by the assessors, to assist the county commissioners as a board of revision for the adjutment and revision of the assessments, additional clerks may then be properly employed. The evidence shows no necessity for these additional clerks between June 1st and Sept. 1st.

16. No evidence of any kind was introduced by the minority commissioner and the controller.

### Discussion.

The assessment of property for the purpose of taxation and the levy and collection of taxes are under the complete supervision of the county commissioners. It is their most important official duty. County taxes are levied in Pennsylvania on the basis of assessments made triennially, supplemented

between the periods of such assessments by assessment of persons and property becoming taxable since the last preceding triennial assessment, and by reassessment of property which has increased or deteriorated in value since such assessments: 1 Eastman on Taxation in Pennsylvania, § 122, pages 109, 110. Assessment involves two distinct acts, first, the preparation of a roll or a list of all the property subject to the tax, and, second, the valuation of such property. The assessment of a tax must be the act of the person chosen to act as assessor, though, of course, it is not required that the officer personally perform every act connected with the assessment and the making of the tax roll, as many of these acts are of a clerical nature, involving no exercise of discretion, and having no relation to any right of the taxpayer: 26 Ruling Case Law, § 311, page 354.

The oath required by law to be taken by the assessor before entering upon his duties fully and completely defines his official responsibilities, to wit: to discover, ascertain and take an accurate account of all the real and personal property within his municipal subdivision and all other objects subject to taxation, assess and value the real estate with improvements thereon and all taxable personal property, and rate all offices and posts of profit, trades and occupations. Section 1 of the Act of May 10, 1929, P. L. 1712, requires that the commissioners shall issue their precepts to the assessors to make the triennial assessment of property on or before June 1st, and the assessors are thereby required to complete the said assessment and make return thereof not later than Sept. 1st. An assessor must complete his assessment on both real and personal property and make return thereof within the time limited by law: Voltz v. Erie County, 81 Pa. Superior Ct. 467. Prior to the Act of 1929, *supra*, the assessor was allowed four months within which to complete and return his triennial assessment. It has now been reduced to three months, beginning on June 1st and ending on Sept. 1st. By section 1 of the Act of May 12, 1921, P. L. 534, the salary of the assessor is fixed at $5 per day, to be paid by the county commissioners out of the county treasury.

From "time immemorial" it has been the practice of the county commissioners in this county to furnish to the assessors in the triennial years, in addition to the precepts, assessment books to be completed by the assessors, in which the clerical force in the commissioners' office have written the names of the taxables, location and general description and size of the taxable property taken from the previous assessment. The county commissioners, for the purpose of the triennial assessment to be made in 1930, and which later is to become the subject of the adjustment and revision by them as a board of revision, employ five additional clerks who are presently engaged in preparing and sending out the precepts and of inserting in the triennial assessment books, preliminary to their delivery to the assessors, the information hereinbefore referred to. The minority commissioner and the controller, as members of the salary board, urge that such employment was illegal and unnecessary because the work being done by these additional clerks should be done by the assessors, and there is no authority for the county commissioners to do it or have it done. We cannot agree that the assessor must personally perform every act connected with the assessment and the making of the tax list because many of the acts are of a clerical nature, and especially so are those now being performed by the clerks in the commissioners' office. The appellees would certainly not contend that the assessor must personally write into the assessment book the list of names and the description of the taxable property. This clerical work might be done by any one. The valuation of the property, requiring the exercise of official discretion on the part of the assessor, must,

of course, be done by him, and under the system employed by the county commissioners will be done by him.

It is important to the administration of the system of taxation in vogue that there should be comprehensiveness, equality and uniformity of assessment. The final determination whether such characterizes a triennial assessment rests with a board of revision, in this county composed of the county commissioners. Under the law, they are authorized to employ all needful assistants and clerks: Act of May 10, 1929, § 2, P. L. 1712; Pardee et al. *v.* Schuylkill County et al., 276 Pa. 246. The accuracy of the assessment as made by the assessor and its return within the time required by law is of the utmost importance to the county commissioners in the performance of their duties, and as public officials they are vested with a reasonable discretion in adopting such necessary and appropriate methods as will enable them to perform a duty imposed upon them. No one would deny the right of the county commissioners, to secure the very best triennial assessment to send out to the assessors with the precept, say, in the City of Pottsville, blue prints of their respective districts to guide them in an accurate and uniform assessment. Yet the doing of such would require employment by the county commissioners without exact statutory authority except as inferable as an anticipatory step in the eventual adjustment and revision of the assessments later to be made by the board of revision. Section 2 of the Act of April 15, 1834, P. L. 509, which we cannot find was ever expressly repealed, although amended and supplemented, authorized the commissioners to direct the form of the list of all taxable persons and property, together with a just valuation, to be made by the assessors. Since the assessments made by the assessors in triennial years form the basis and subject-matter of the action of the county commissioners as a board of revision later functioning according to the statute, we conclude that the commissioners have the right to do such clerical work as will make for accuracy in the assessors' work, expedite and guarantee the completion and return of it within the limits required by law. And we, therefore, hold that there is legal authority for the employment of the five additional clerks. And since it is in evidence that this number of additional clerks has always been employed not only by this board of commissioners but by previous ones, of which the minority commissioner as well as the county controller were members, it is some evidence of the necessity of the employment. And because of the change of time in which the triennial assessment must be made since the Act of 1929, *supra,* we have found they are now necessary. Not only do we deem the method employed by the county commissioners to make for greater accuracy and comprehensiveness of assessment, but we believe that it is as economical to the county, since the listing of the taxables and taxable property, as contended for by the appellees, would require a greater time on the part of the 107 assessors in the county at a daily cost of $5.

We, however, believe that the necessity for the employment of these five additional clerks, under the evidence, ends on June 1, 1930, as by that time the assessment books and the precept books must be in the hands of the assessors. Until Sept. 1st, after June 1st, the evidence shows no need of them. We can readily see that additional clerks would be needed during the time of preparation for and the doing of the work of the board of revision after Sept. 1st.

### Conclusions of law.

1. The employment by the county commissioners of the five temporary clerks for the purposes herein found, four from March 4, 1930, and one from March 5, 1930, is legally warranted.

2. There being no evidence of necessity thereafter, the employment should legally cease on June 1, 1930.

*Order.*

And now, May 19, 1930, the county commissioners are allowed four additional clerks from March 4, 1930, and one additional clerk from March 5, 1930, to June 1, 1930, at $160 per month, for the purposes of preparing and sending out precepts to the assessors for the triennial assessment in 1930 and the insertion into the assessment books to be delivered to the respective assessors of such information as is hereinbefore referred to, and such other information as will assist the assessors in accurately, uniformly and expeditiously making the triennial assessment.

From M. M. Burke, Shenandoah, Pa.